IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 16, 2019 Session

**STATE OF TENNESSEE v. SHALONDA WEEMS**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-1508     Monte Watkins, Judge**

_____

**No. M2018-02288-CCA-R3-CD**

_____

Shalonda Weems, Defendant, was indicted in a two-count indictment for aggravated child neglect and felony murder in connection with the starvation death of her six-month-old child. The jury found Defendant guilty of aggravated child neglect and reckless homicide. Defendant filed a Tennessee Rule of Criminal Procedure 29(e) Motion for Judgment of Acquittal ("the Motion") as to both counts. Following a hearing, the trial court granted the Motion in part, set aside the guilty verdict for aggravated child neglect, and entered a judgment of acquittal. The court denied the Motion as to the reckless homicide verdict and entered a judgment of conviction. The State appeals claiming that the trial court erred in granting the Motion. After a thorough review of the record and applicable law, we affirm the trial court's judgment of acquittal for aggravated child neglect.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR. and TIMOTHY L. EASTER, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela S. Anderson, Assistant District Attorney General, for the appellant, State of Tennessee.

Michael A. Colavecchio, Nashville, Tennessee, for the appellee, Shalonda Weems.

# OPINION

## Factual and Procedural History

Defendant's child, Kar'mn J'Qua Weems ("Kar'mn"), was born on September 5, 2004. Defendant and Kar'mn were discharged from the hospital on September 7, 2004. Kar'mn died on March 3, 2005. Defendant was interviewed by detectives of the Metropolitan Nashville Police Department (MNPD) on March 3, 2005, October 21, 2005, and July 7, 2014.

On June 23, 2015, more than ten years after Kar'mn's death, the Davidson County Grand Jury indicted Defendant for aggravated child neglect in violation of Tennessee Code Annotated section 39-15-402 and first degree felony murder during the perpetration of or attempt to perpetrate aggravated child neglect in violation of Tennessee Code Annotated section 39-13-202(a)(2). The case was tried by jury on September 25 and 26, 2018. The trial court denied Defendant's motion for judgment of acquittal at the close of the State's proof, although the trial court expressed concern about "the knowingly aspect" of both counts. At the conclusion of the proof, the case was presented to the jury on charges of aggravated child neglect and second degree murder.[1] The jury returned a guilty verdict of aggravated child neglect and reckless homicide, a lesser-included offense of second degree murder.[2]

---

[1] Neither the record nor the briefs explain how the indicted offense of felony murder was reduced to second degree murder, the offense on which the jury was instructed. However, because the sole issue in this appeal relates to the judgment of acquittal dismissing the aggravated child neglect count, that information is not necessary for the purposes of this appeal.

[2] Defendant did not appeal the denial of the motion for judgment of acquittal on the reckless homicide count, and the State efficiently abridged the record to provide the transcripts, exhibits, and documents necessary for this court to decide the issue raised by the State—whether the trial court erred in granting the judgment of acquittal on the aggravated child neglect count. However, we note that the reckless homicide occurred on March 3, 2005, and that Defendant was indicted on June 23, 2015, well after the expiration of the four-year statute of limitation for Class D felony reckless homicide. *See* Tenn. Code Ann. § 40-2-101(b)(3). "[A]n accused who is indicted for an offense, which is not barred by the statute of limitations, may not be convicted of a lesser-included offense which is time barred by the statute" unless the accused knowingly and voluntarily waives the statute of limitations. *State v. Pearson*, 858 S.W.2d 879, 885 (Tenn. 1993). The only pleading in this abridged record that even suggests that Defendant waived the statute of limitations for reckless homicide was Defendant's "Motion for Jury Instructions—Lesser Included Offenses" by which Defendant requested the trial court charge voluntary manslaughter, reckless homicide, and criminally negligent homicide as lesser-included offenses of second degree murder. We cannot presume Defendant waived the statute of limitations based on her written request for jury instructions for lesser-included offenses. *State v. Marchello Karlando Gossett*, No. W2015-02414-CCA-R3-CD, 2017 WL 1163683, at *30 (Tenn. Crim. App. Mar. 28, 2017), *perm. app. denied* (Tenn. Aug. 18, 2017). However, to address the issues raised on appeal, we do not need to determine whether Defendant knowingly and voluntarily waived the statute of limitations for reckless homicide.

Defendant timely filed a written Motion for Judgment of Acquittal pursuant to Tennessee Rule of Criminal Procedure 29(e)(1). The Motion was argued on October 31, 2018. In its oral ruling, the trial court noted that it had not accepted the jury's verdict in its role as thirteenth juror. The trial court found that there was insufficient evidence to prove that Defendant acted "knowingly" and set aside the verdict of guilty of aggravated child neglect. The court denied the Motion as to reckless homicide and confirmed the jury's verdict.

In its written order entered December 5, 2018, the trial court stated:

After careful consideration in observing the evidence in the light favorable to the prosecution, the [c]ourt does not accept the verdict in [c]ount [o]ne for insufficient evidence regarding Defendant's mens rea of "knowing" element of T[ennessee] C[ode] A[nnotated] section 39-15-401 and [section] 39-15-402.

## Summary of Trial Testimony and Evidence

*Testimony of Detective Joseph L. Cooper*

MNPD Detective Joseph L. Cooper, who was assigned to investigate Kar'mn's death, was the first witness called by the State.[3] By the time Detective Cooper arrived at Defendant's home, Kar'mn had been transported to Vanderbilt University Medical Center ("VUMC"). The detective proceeded to the hospital where he spoke to a social worker who identified Defendant as Kar'mn's mother.

Detective Cooper spoke with Dr. Olivia Titus who had spoken to Defendant. According to the information obtained from Defendant by Dr. Titus, Defendant "had been sick for the last couple of days with the flu and was recovering from that illness." Kar'mn "had also been ill and Defendant had been giving [her] Children's Tylenol." Defendant "fed [Kar'mn] formula the night before . . . around [eleven] o'clock" and put Kar'mn to bed right after she fed her. Defendant checked on Kar'mn around 3:00 a.m. and 5:00 a.m., and Kar'mn "appeared to be normal at that point." Defendant woke up around 6:30 a.m. and checked on Kar'mn around 7:15 a.m., at which time Kar'mn was lying on her back "barely breathing" and looked "blue and weird." Defendant telephoned her mother and told her Kar'mn was not breathing. Defendant's sister, who was present at Defendant's mother's home, called 9-1-1.

---

[3] Detective Cooper had been retired from MNPD for approximately five and a half years when he testified at Defendant's trial on September 25, 2018.

Detective Cooper obtained medical releases from Defendant and contacted the Department of Children's Services concerning Defendant's two other children. He obtained consent to search Defendant's home where he took photographs and collected various items, including "a blanket, an infant bed cover, a circular infant pillow, Kleenex, a bottle with formula, an empty baby bottle, a white shirt[,] and a[n] infant bed sheet." Detective Cooper next interviewed Defendant. The audio recording of that interview was played for the jury, and the photographs taken by Detective Cooper were published to the jury. Detective Cooper also interviewed Laura Owens, the manager of Creative Academy, the daycare provider for Kar'mn and Defendant's two other children.

Detective Cooper interviewed Defendant again on October 21, 2005, and questioned her about whether the formula she gave Kar'mn had been watered down. He told Defendant that the autopsy report listed the cause of death as starvation and malnutrition. Detective Cooper said Defendant did not seem concerned or surprised by the autopsy findings. The digital versatile disc ("DVD") and transcript of the March 3, 2005 audio interview and the October 21, 2005 audio/video interview were admitted for identification.

On cross-examination, Detective Cooper stated that the medical examiner told him on March 7, 2005, that the manner of death had been classified as a homicide and that Kar'mn had been "suffering from pneumonia and a thyroid disorder."

*Testimony of Laura Owens*

Laura Owens testified that she was the owner of Creative Academy and had worked there for forty-five years. She said Kar'mn had attended Creative Academy in 2005 and that she had talked to the police about this case shortly after Kar'mn's death. She said Creative Academy does not provide formula for infants and that the parents are expected to prepare bottles at home and bring them for their children. She said Defendant brought water and juice for Kar'mn, and she told Defendant that "[Defendant] was feeding her baby wrong" and that the "baby wasn't supposed to have juice and water, the baby should have a formula." She said the workers at Creative Academy would typically feed an infant a bottle every two to three hours. Ms. Owens said that Defendant kept her three children "all clean and neat." Ms. Owens was shown two autopsy photographs of Kar'mn. She said Kar'mn never came to Creative Academy looking like she did in the photographs and that, if she had, "we would have had to report that." On cross-examination, Ms. Owens agreed that Defendant brought bottles filled with formula to Creative Academy. Ms. Owens said that Defendant was never told she could not bring Kar'mn because she was not providing enough formula. When questioned about the last time she saw Kar'mn, Ms. Owens answered:

Well, the last time I saw her was in her little pink boxers there, but before she was trying to bring her to the daycare, the baby was sick, and we did not accept her, and then the next thing we knew, the baby had died.

Ms. Owens thought the last day she saw Kar'mn was Friday because "like two or three days later the baby was deceased."

*Testimony of Detective Selene Julia*

Selene Julia, a detective with MNPD, assisted Detective John Grubbs, who in 2013 was assigned to investigate Kar'mn's death. As part of the investigation, she assembled and reviewed the VUMC medical records. Without objection, the records were admitted into evidence, and Detective Julia testified from them.

The record for September 7, 2004, showed that Kar'mn was born on September 5, 2004. She weighed six pounds, ten ounces. Defendant was advised how to enroll in WIC[4] and TennCare. Defendant also enrolled in the Healthy Start Program that included home visits by nurses. She was already receiving aid from Families First and food stamps. Defendant was provided pamphlets and instructed about bottle-feeding and breastfeeding. Defendant elected to breastfeed, and the nurse reported that the baby "latched." Defendant demonstrated to medical personnel that she could properly feed Kar'mn, and the nurses reported that Kar'mn tolerated feeding well before they were discharged on September 7, 2004.

On September 10, 2004, Kar'mn presented to VUMC for a newborn follow-up visit. Defendant reported that she had been breastfeeding for three days and that Kar'mn was spitting up after feeds. The medical record stated under "nutrition":

Breast Feeding: per mom, latches well, unsure whether milk has come in, reports that she can see milky fluid going into infant's mouth, however her breast have not started to feel engorged. Does not have breast pump. Formula feeding: Brand of formula: Soy (?) in purple and gold can. WIC participation: yes.

Kar'mn was found to be jaundiced and dehydrated. Defendant was instructed to give Kar'mn soy formula.

---

[4] WIC is an initialization for the Special Supplemental Nutrition Program for Women, Infants, and Children.

On September 13, 2004, Kar'mn presented to VUMC for the second newborn follow-up visit. The report showed that Kar'mn had been feeding and stooling well since her last appointment and had gained five ounces. Her "general appearance" was "well[-] developed, well[-]nourished; alert and vigorous."

On September 23, 2004, Kar'mn was presented to VUMC for her two-week checkup. She weighed 6.13 pounds. The notes from the checkup stated:

> Interval history and ROS update: Kar[']mn has been seen twice in newborn follow-up clinic for weight and bilirubin checks.[5] She has lost approximately [ten percent] of her birth weight and has not shown any gain at this point. Mom says that she takes [five to six ounces] every [two to three] hours but on further questioning this seems unlikely. Mom says that she sleeps through the night and really only takes [three to four] feeds during the day. She is a vigorous feeder and has no respiratory distress with feeds; takes them in [ten to fifteen] minutes.

> Mom has her Good Start with her today and can demonstrate how to mix the formula correctly. With her last baby she admitted to occasionally adding extra water to make the formula go further, but denies doing that now.

A note from VUMC dated September 30, 2004, stated that the infant "came in for a weight check today" and weighed six pounds and eleven ounces.

On November 24, 2004, the infant was presented to VUMC for her two-month checkup. She weighed nine and a half pounds and her "general appearance" was "well[-]nourished[,] alert[,] and vigorous." The "impression" was a well infant, normal growth and normal development. The "plan" was to "[c]ongratulate[] mom on Kar[']mn's excellent growth. Mom has done an excellent job given [her] young age, and having three babies all under the age of [four]."

Defendant took the child to the VUMC Emergency Department on December 7, 2004, with complaints of a "five-day history of diarrhea without emesis."[6] The note said that she had a viral illness causing diarrhea. The diagnosis was "[e]nteritis without dehydration[,]" and the note stated no further "intervention" was needed.[7]

---

[5] ROS is an initialization for review of systems. An excess of bilirubin in a baby's blood causes jaundice.

[6] Emesis is vomiting.

[7] Enteritis is an inflammation of the small intestine.

On January 26, 2005, the infant presented at VUMC for a health maintenance visit. She weighed 11.62 pounds and her "general appearance" was listed as "well[-]developed, well[-]nourished: alert and vigorous." The "impression" was a well infant, normal growth and normal development. Kar'mn received her scheduled immunizations.

The March 3, 2005 VUMC report made on the day of Kar'mn's death listed the chief complaint as "apnea,"[8] after which the report stated:

HISTORY OF PRESENT ILLNESS: Kar['mn] is a [five]-month-old female with no significant past medical problems, who per mom was found in her crib this morning blue and not breathing. Mom states that she was playful after eating and drinking well yesterday. She gave her a dose of Tylenol for her fever last night. She went to bed per usual. This morning she went into her room to wake her up and she found she was not breathing and appeared blue. She states that she called her mother, who then called the police. Upon EMS's arrival, they stated she was apneic with no spontaneous respirations and no pulses. They intubated her, placed an IO.[9] En route they gave four rounds of epinephrine and Atropine and had documented PEA[10] on the cardiac monitor. She had no pulses with CPR or without CPR.

The diagnosis was "[c]ardiopulmonary arrest." The progress note stated:

Referred today by charge nurse regarding child's family in need of support given fact child had just expired. I met with mother, two grandmother[s] and several other family members and provided support and crisis intervention.

The mother is [nineteen] years old and has two other children ages [two] and [one]. The father of [Kar'mn] is in prison. Mother asked that I locate Ramona Shelton, the baby's paternal grandmother, at her workplace and ask her to come here. I did reach the grandmother who did come and provide support to the family. I did not ask the mother questions about how she found child as detectives were already involved at this point. I assisted in reaching incarcerated family members via chaplains at the local prisons. Karl Archibald, the baby's father[,] was one of these and he was able to talk with the mother and his mother via phone.

---

[8] Apnea is the cessation of breathing, especially during sleep.
[9] IO is short for intraosseous infusion, a process of injecting fluids directly into the marrow of a bone when intravenous access is not available or not feasible.
[10] PEA is an initialism for pulseless electrical activity.

At the conclusion of the direct examination of Detective Julia, the DVD of Defendant's March 3, 2005 audio interview was played for the jury.

*March 3, 2005 Audio Interview of Defendant*

The March 3, 2005 interview was conducted by Detective Cooper and Detective Tom Bowden at VUMC. Defendant stated that, in addition to Kar'mn, she had two boys both under the age of three. She said Kar'mn's father had been in custody for about six months. She said that on Wednesday, March 2, she and her three children were at home all day. She had been sick. She woke up close to noon, and the family watched television and ate ice cream. She "gave [Kar'mn] milk, cereal, and baby food. Then gave her a water bottle, gave her a bath, and they laid down for a nap" around 2:00 p.m. Kar'mn woke from her nap around 4:40 p.m. They watched television, and she said Kar'mn "roll[ed] all over the bed." Defendant said that Kar'mn was "normal all day" and that "she ate well." She fed Kar'mn a bottle around 6:00 p.m. and a bottle with milk and cereal around 8:30 p.m. They watched American Idol and then went to bed around 9:15 p.m. Kar'mn was in her crib, and the two boys were in bed with her. She checked on Kar'mn around 1:00 a.m. She went to the bathroom around 3:00 a.m., and Kar'mn was still sleeping so she went back to bed. She woke up at 6:30 a.m. but went back to bed. She got up again around 6:50 a.m. and went to the kitchen to fix the two boys some orange juice. She then checked on Kar'mn.

The following dialogue concerned what occurred after she checked on Kar'mn:

DETECTIVE COOPER: Okay. So, you run in there and found her and she didn't appear to be breathing?

DEFENDANT: She was like barely, barely, barely, (demonstrates shallow breathing) like a very little teeny breath[], breaths.

DETECTIVE COOPER: And, uh, she started taking on a blueish color?

DEFENDANT: She looked[] just funny. I don't know, she-

DETECTIVE COOPER: Okay. Well, I understand. We, [k]now she laying on her, how was she laying? On her back? Face up?

DEFENDANT: Um, she had flipped on her back. She be rolling in her bed.

DETECTIVE COOPER: Okay. So when you put her to bed she normally sleeps on her, on her?

- 8 -

DEFENDANT: On her back.  Well, yeah, on her back.

DETECTIVE COOPER: When, when you, uh, checked on her like at five o'clock, was she on her back or on her stomach?

DEFENDANT: On her back.

DETECTIVE COOPER: Okay. And then when you went in there and checked her at seven-thirty she was, she was on her back.

DEFENDANT: Uh-huh.

DETECTIVE COOPER: Okay.  Uh, so you called your mother?

DEFENDANT: Uh-huh.

. . .

DETECTIVE COOPER: Okay.  Um, is there anything else that you can think of?   Is, was there anything you can think of, was there anything about the child yesterday that, sort of, you thought was unusual or odd about, about her behavior or the way she was breathing, or?

DEFENDANT: She was fine.  I don't understand.

DETECTIVE COOPER: So, and when was, when was the last, the last time that we, that she was fed?  I know you gave her a bottle at eleven.  Did you give her another one at three?

DEFENDANT: No, she wasn't up at three.  I said I checked on her at three.

*Testimony of  Dr. Amy Hawes*

Dr. Amy Hawes, a forensic pathologist employed by the Knox County Regional Forensic Center, was qualified as an expert in forensic pathology.[11]  She explained that part of her duties as a forensic pathologist is to determine and report on the cause and manner of death.  She stated that the cause of death is "the injury or illness that sets into motion the change of events that lead to death" and that the manner of death "refers to the circumstances in which someone has died."

---

[11] In 2005, Dr. Hawes was employed at the Davidson County Medical Examiner's Office.

Dr. Hawes said she performed an external examination, which showed that Kar'mn weighed ten and a half pounds, her lips were cracked and dried, her skin was slightly doughy, her eyes were slightly sunken in her head, her hair was sparse, and her anterior fontanel was slightly sunken. She opined that her examination showed physical characteristics that were consistent with a child suffering from dehydration and malnutrition.

Dr. Hawes said that she performed an autopsy which she described as "an extensive surgical procedure where you examine the body" and document the findings. Dr. Hawes said the autopsy revealed that there was sparse fat around Kar'mn's bowels, abdomen, and adrenal glands, which was indicative of prolonged malnutrition. The gastrointestinal tract from the stomach to the rectum was empty. A test of the vitreous fluid from the eyes indicated that Kar'mn's sodium and chlorine levels were high, indicating dehydration.[12]

Dr. Hawes's diagnosis was:

[Kar'mn] had severe dehydration. There was evidence of acute and chronic malnutrition, as evidenced by, there was the absence of food and feces in waste products, in other words there was no feces in the colon. The thymus gland [was] shrunken or atrophied[.]

. . .

She had atrophy or loss of a lot of the fat around some of her internal organs, and she had fat in her liver cells where normally in an infant there really should not be any fat in the liver cells.

In response to hypotheticals presented by the State, Dr. Hawes opined that her autopsy findings were not consistent with a child that "had been fed cereal, milk and apple[]sauce within [twenty-four] hours of death . . . unless there was some indication that this child was having a lot of diarrhea." She stated that, even with diarrhea, she "would expect to see something at least in the lower gastrointestinal tract[.]" Dr. Hawes opined that her findings would not be consistent with a child who had been fed formula a few hours prior to being found unresponsive and that she would not expect a child "who had nothing in its gastrointestinal tract" to be "rolling back and forth in the bed and acting normal" only hours before the child died.

---

[12] Vitreous fluid fills the space between the lens and the retina of the eye.

Based on her external examination and the autopsy, Dr. Hawes's opinion was that the cause of death was "dehydration and malnutrition" and that a contributing cause of death was "interstitial pneumonitis." She said the "manner of death was classified as homicide" and the "circumstances of death were neglect."

On cross-examination, Dr. Hawes agreed there were no signs of trauma. She also stated that she would "never make the diagnosis of dehydration just based on an external examination alone." Concerning any history of Kar'mn being sick shortly before her death, the following dialogue occurred during defense counsel's cross-examination of Dr. Hawes:

Q. So you wouldn't know if the child had been sick the week before?

A. I wasn't provided that history, so, again, as part of an autopsy, and determination of final cause of death, we ask for history, and that was not provided to me.

Q. Or even just days before obviously, since you didn't have something from the week before, you didn't have anything from the few days before?

A. Not medical records, no. I had a history from other people, but not medical records, so.

Q. Right. So you don't know if the child had been sick on Monday? The child died on Thursday, you don't know if the child had been sick on Monday?

A. I wasn't provided with that information. I was told that she had a bit of a fever, so.

Q. But you didn't have any medical records about that though to compare?

A. Right, but there's a difference again to just be clear between someone being sick and having medical records, obviously someone can be sick and you don't have medical records necessarily, we don't go to the doctor every time we're sick. But to clarify, yes, I was told that the child did have a fever I believe a day or so prior to death, but no, I don't have any medical records from that time.

Q. So you couldn't consider any medical issues the child had a few days or even a week prior to the baby's death in your autopsy conclusions?

A. Well I would consider it because, again, we elicit history, and so I take in the account any history that I've been provided, so yea, I would take it into account.

Q. All right. But you didn't have any -- you only had some information that the child may have had a fever a few days before?

A. Sure.

Q. That's the only recent, as in a week or so before the child's death, that you had for purposes of preparing the autopsy?

A. To the best of my recollection, it's been many years ago, but to the best of my recollection, yes.

Q. Now, if a child or a person for that matter consumes or has a liquid or food put in their mouth, and even baby swallows a little bit of it, but either spits it up in the case of where they just had it in their mouth or if they throw it up, if it got down into their stomach, you wouldn't be able to see that in the autopsy if it had happened a day or two before?

A. Correct.

*Autopsy Report*

The autopsy report from which Dr. Hawes testified was entered as an exhibit. The "final anatomic diagnosis" of the autopsy report showed:

A. Severe dehydration.

B. Acute and chronic malnutrition:
    1. Absence of food and waste products in gastrointestinal system.
    2. Marked involution of thymus gland.
    3. Atrophy of visceral fat.
    4. Macrovesicular steatosis of the liver.

The autopsy report stated the cause of death was "[d]ehydration and malnutrition," the contributing cause of death was "[i]nterstitial pneumonitis," the "manner of death was

- 12 -

"[h]omicide," and the circumstances of death was "[n]eglect." The infant weighed ten and a half pounds at the time of the autopsy.

*Testimony of Dr. Timothy Robert*

Dr. Timothy Robert, Chief Science Officer of Aegis Corporation (Aegis), explained that Aegis is a laboratory that primarily performs mesenteric toxicology testing.[13] Dr. Robert explained that, in the past, Aegis performed postmortem toxicology testing for the Davidson County Medical Examiner's Office and medical examiner offices in other counties in Tennessee. In March of 2005, the Davidson County Medical Examiner's Office submitted a specimen of vitreous fluid for testing. Aegis analyzed the fluid to measure sodium, chloride, and blood unit nitrogen. The results were sent to Dr. Hawes at the Davidson County Medical Examiner's Office. On cross-examination Dr. Robert agreed that the Aegis' laboratory was not certified until 2008.

*Testimony of Detective John Grubbs*

Detective John Grubbs testified that he had worked at MNPD for twenty years. He explained that, in 2013, he worked in the Youth Services Division where he investigated "child neglect and deaths of children twelve years of age and under." He said that, in 2013, his superior officer assigned Kar'mn's case to him. Detective Grubbs began by reviewing everything in the case file, including the two recorded interviews Detective Cooper had with Defendant. He testified that he noticed that Defendant displayed a lack of emotion when Detective Cooper told her the cause and manner of death. He said that there were discrepancies in the times during the day when she fed Kar'mn. Detective Grubbs interviewed Defendant's mother, Velina Dixon, and Defendant's sister, Shameka Dixon. He reviewed the phone records of Defendant and listened to the 9-1-1 call. He said there was a call from Defendant's phone to her mother's phone at 7:38 a.m. and that Defendant's sister called 9-1-1 at 7:39 a.m. He said Defendant stated that she woke up around 6:30 a.m. but went back to bed and woke up again at 7:15 a.m. and went to check on Kar'mn. Defendant stated that she did not realize there was something wrong until around 7:30 a.m.

Detective Grubbs contacted Defendant and arranged for another interview. Detectives Grubbs and Julia interviewed Defendant on July 7, 2014. After the interview, Detective Grubbs obtained an indictment and arrested Defendant. As she was being arrested, a male opened the door and asked what this was pertaining to, and Defendant answered "that baby thing."

---

[13] The mesentery is a fold of membrane that is attached to the abdominal walls.

On cross-examination, Detective Grubbs agreed that no other investigator from MNPD had contacted Defendant during the nine-year time span since the last interview. He said Defendant claimed in the 2014 interview that Kar'mn had vomited but that vomiting never came up during the March 2005 interview. When questioned about Defendant saying Kar'mn had thrown up in the second 2005 interview, Detective Grubbs said, "She may have. I don't remember on the 2005." The following dialogue is from defense counsel's cross-examination of Detective Grubbs concerning Defendant's October 21, 2005 interview:

> Q. . . . Now, would you be surprised if she had mentioned if [Defendant], in the few days prior to March 3[], 2005, had mentioned she was sick seven times?
>
> A. If it was seven times, it was seven times, I didn't count. I didn't count the number of times she mentioned she was sick.
>
> Q. But you wouldn't disagree with that at this point?
>
> A. No.

Detective Grubbs agreed that he was in the courtroom when Ms. Owens testified that she had not allowed Kar'mn to come to daycare because she was sick a few days before her death. Concerning Kar'mn being sick, Detective Grubbs also agreed that the September 10, 2004 medical record indicated that Kar'mn had problems feeding and was spitting up, that the September 13, 2004 medical record showed that she was dehydrated, and the December 7, 2004 medical record showed that Defendant took Kar'mn to the emergency room with a five-day history of diarrhea. Detective Grubbs agreed that Defendant stated numerous times during the 2014 interview that Kar'mn had been sick before she died, even when Detective Julia rhetorically questioned Defendant by stating that Kar'mn had not been sick.

Near the conclusion of the direct examination of Detective Grubbs, the redacted October 21, 2005 audio/video interview of Defendant and the July 7, 2014 audio/video interview of Defendant were admitted as evidence and played for the jury.

*October 21, 2005 Audio/Video Interview of Defendant*

The October 21, 2005 interview was conducted by Detectives Cooper and Bowden at the MNPD station after the autopsy report became available. Defendant was advised that she had the right to remain silent, that she was not being restrained, and that she was free to leave at any time. Defendant stated that she was born on May 15, 1985. She

finished the ninth grade and was planning to get a GED. She stated that Kar'mn had to be six weeks old before Defendant could take her to daycare. At daycare, Kar'mn had scheduled feedings at nine, eleven, two, and four o'clock. She sent sufficient bottles for Kar'mn to daycare each day. For breakfast, she prepared a bottle with formula, baby food, and cereal. The second bottle contained water for Kar'mn to "flush the cereal and food down so she wouldn't be constipated." The third bottle contained juice, and the fourth bottle contained formula and baby food. She said Kar'mn spent the night with her mother on Friday, February 26, and Saturday, February 27. Her mother had formula at her house to feed Kar'mn. Defendant became ill with a "real bad cold" on Monday, March 1, and stayed in bed most of the day. She did not take the kids to daycare. She said that she started feeling better on Wednesday, but because her car was not running, she did not take the kids to daycare. She said Kar'mn was "running a fever" so she gave her Infant Tylenol. Defendant's cousin Marcus came over on Tuesday and stayed with the kids for thirty minutes while she ran some errands. Defendant said Kar'mn was fine when she left and "was eating and everything." When asked about how Kar'mn felt on Wednesday night, Defendant answered:

> Yeah, like I said, we was watching TV and I gave them some ice cream. And like I said, she was rolling up and down the bed, up and down the bed, up and down the bed. After we, uh, got out of the tub and stuff I wiped her down and, I mean, after we got out of the tub I fed that last little bottle. It was cereal, milk, and baby food. And then she went right to sleep.

When questioned again about Kar'mn's condition on Wednesday night, Defendant said:

> We got out of the tub, nah, before we got in the tub, while they was eating I was feeding her a bottle. And then after that we had ice cream and cake, from what I recall. But she didn't have no cake. And we was watching the TV show that we always watch. And while I was feeding them ice cream and cake she was rolling up and down the bed, up and down the bed. And like I said, after we got out of the tub I fed her that bottle and she went straight to sleep and we went to sleep.

Defendant said she fed Kar'mn around 8:00 p.m. and again around 10:00 p.m.

Defendant said that, when they got home from VUMC after Kar'mn was born, Kar'mn "kept gagging and throwing [the milk] back up." She said that, once she switched to Isomil formula, Kar'mn "started taking the formula much better and she started eating more." Dr. Susan Fowler, Kar'mn's pediatrician, told Defendant at one of Kar'mn's appointments that she was putting too much water in Kar'mn's formula. Defendant changed the way she was preparing the formula. Defendant prepared the

formula and food for daycare.  She said the daycare staff gave her a bottle at nine, eleven, two, and four.

When asked if she knew the cause of Kar'mn's death, Defendant stated "crib death" or "SIDS."[14]  This dialogue followed:

DETECTIVE COOPER: Okay, well here's our problem, the autopsy came back on the child and the cause of death was dehydration and malnutrition.

DEFENDANT: Uh-huh.

DETECTIVE COOPER: With secondary cause of pneumonia.

DEFENDANT: Dern.

DETECTIVE COOPER: And this has been classified as a homicide.

DEFENDANT: Lord.

DETECTIVE COOPER: In other words, the death of the child was caused by another person.

DEFENDANT: Um-

DETECTIVE COOPER: And, uh, the, the reason we're asking you all these questions is, is we gotta establish the child, all this didn't happen in one day.  This is evidently something that's been going on for a while because the child, you know, stayed on one weight-

DEFENDANT: Uh-huh.

DETECTIVE COOPER: And the[n] all of a sudden it lost all its fluid and it, it died, you know.

DEFENDANT: No, I-

DETECTIVE COOPER: And the thing is during this period you were sick.

---

[14] SIDS is an acronym for sudden infant death syndrome.

- 16 -

DEFENDANT: Uh-huh, but that still don't got nothing to do with me feeding them.

DETECTIVE COOPER: Well it does because see the other problem we have is the child, they, they didn't find anything in the child's digestive system.

DEFENDANT: What does that mean?

DETECTIVE COOPER: Generally[,] it takes twenty-four hours for food to digest and pass through the system.

DEFENDANT: Uh-huh.

DETECTIVE COOPER: The child didn't have anything in its system.

DEFENDANT: Um-

DETECTIVE COOPER: Which tends to indicate the child hadn't had anything to eat the night before, there's no way-

DEFENDANT: No, I fed her before she went to sleep. Y'all didn't find the bottle in the bed? Cause-

DETECTIVE COOPER: Well, I mean, the, the bottle was there and I took that. But there's also a problem with the baby being dehydrated and have-

DEFENDANT: I[t] could've been because I cut the heat on too. I was, like having being hot then cold, then hot then cold. That could've had, that's what they told me could've had a lot to do with it. Because when I was sick it was basically like the flu. And I kept on cutting the heat on, then the air on, then the heat on, then the air on.

DETECTIVE COOPER: Well, that's, the cause of death is, is, is basically the child didn't have any water and was, and was so depressed from being malnourished and it-

DEFENDANT: What does that mean?

DETECTIVE COOPER: Well it means it wasn't getting sufficient food to surv-, to thrive and survive. I mean, it's just like if-

- 17 -

DEFENDANT: Uh-uh, no, that can't be right.

DETECTIVE COOPER: Well I'm-

DETECTIVE BOWDEN: The thing is that there's facts that, that myself or this detective, or you cannot [put] aside.

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: There's nothing more than facts that happened and what's on these reports and with these doctors. That's why we wait for the official autopsy reports.

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: Okay, what's on that paper is what happens.

DEFENDANT: Aww, okay.

DETECTIVE BOWDEN: Alright, that's, the reason why that child died is because dehydration, and that means no fluids. And malnutrition, not enough food.

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: That's why the child died.

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: And you're the caregiver of this child, correct?

DEFENDANT: Yes, sir.

DETECTIVE BOWDEN: Alright. We're here to speak to you because you're the one that supposed to keep this child alive.

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: Alright. The child's not alive any longer.

DEFENDANT: I know.

DETECTIVE BOWDEN: Because of someone.

DEFENDANT: Yeah, but I-

DETECTIVE BOWDEN: Alright. And, and that's what we need to find out. It's just, you can't pass this along.

DEFENDANT: I know I can't, I can't get over it either.

DETECTIVE BOWDEN: You can't pass, you can't pass, you can't pass, um, you know, saying well it couldn't happen this is it. The, the heat and the air condition does not cause dehydration.

DEFENDANT: Okay.

DETECTIVE BOWDEN: Alright. Fluids are what causes dehydration.

DEFENDANT: Okay.

DETECTIVE BOWDEN: Alright. So just try to work and help yourself by telling the truth about what you can remember.

DEFENDANT: Aww, I'm telling the truth. That's what I'm saying.

DETECTIVE BOWDEN: Okay.

DEFENDANT: Yeah, but I did feed her. That's what I'm saying.

DETECTIVE BOWDEN: I mean, accidents happen.

DETECTIVE COOPER: Well-

DEFENDANT: Nah, it wasn't no accident.

DETECTIVE BOWDEN: Alright. I mean, as far as, I mean, not an accident, but accidents can happen as far as, without you even knowing-

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: If you're not, if, if you were cutting back on the, on the food.

DEFENDANT:  I wasn't cutting back on the food though.

DETECTIVE BOWDEN:  If you were, you know, not giving them enough liquids, you know.

DEFENDANT:  I was giving her food though, that's what I'm saying. That's what I can't understand.

DETECTIVE BOWDEN:  Yeah.

DETECTIVE COOPER:  Well you, you can give a child food and still, if you're not giving them adequate, giving him or her adequate amounts-

DEFENDANT: Yeah.

DETECTIVE COOPER: The, the child's not gonna thrive and digress and-

DEFENDANT: The days that, the days that she was feeling bad she wasn't eating as much though.

DETECTIVE COOPER:  Yeah, well I understand that.

DETECTIVE BOWDEN:  Okay, well that's, I mean, that helps, you know.

DEFENDANT:  Yeah.

DETECTIVE BOWDEN: I mean, if a child doesn't eat-

DEFENDANT:  Yeah.

DETECTIVE BOWDEN:  And he's, if he's, if you're trying to feed a child and then he spits up everything-

DETECTIVE WEEMS:  Uh-huh.

DETECTIVE BOWDEN:  And no matter what you try to do-

DEFENDANT:  Uh-huh.

DETECTIVE BOWDEN:  That means he's not eating.

DEFENDANT: Yeah. But I'm saying she took it but she just wasn't taking it as well.

DETECTIVE BOWDEN: Okay.

DEFENDANT: But how I knew that she was getting better because she was eating more. That's what I'm saying. But she, the days that she was sick she wasn't just taking as much. That's what I'm saying.

DETECTIVE BOWDEN: Uh-huh. How, how many days was she actually sick? I know, we're talking about Tuesday.

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: That was the first day that you were saying that she was sick.

DEFENDANT: Uh-huh.

DETECTIVE BOWDEN: But Wednesday night you're saying that you fed her, you know-

DEFENDANT: Yeah.

DETECTIVE BOWDEN: About ten o'clock. And then Thursday is, you know, the day that she was discovered.

DEFENDANT: Yeah.

DETECTIVE BOWDEN: Alright. So was it more days than Tuesday?

DEFENDANT: Nah, it wasn't no more days before then. That's what I'm saying.

DETECTIVE BOWDEN: Was she coughing?

DEFENDANT: She was coughing.

DETECTIVE BOWDEN: Uh-huh.

DEFENDANT: Like I said, I was sick too though. That's what I'm saying.

DETECTIVE BOWDEN: Uh-huh.

DETECTIVE COOPER: Well that, that's why I was bringing up the question how sick were you, I mean, you-

DEFENDANT: I mean, I really wasn't just sick, sick. But I just like had a cold. And I kept, I'm thinking it was like gonna be on the edge of the flu if I didn't do nothing about it. So I got the cough medicine, the cough drops, and the spray. That's what I'm saying. And after I took all that it really was, I got better.

DETECTIVE BOWDEN: You were okay. Yeah.

DEFENDANT: Yeah, that's what I'm saying.

DETECTIVE BOWDEN: Well how many days do you think that, that she may have been sick before she started noticing, before you started noticing it? Is there anything that would've shown that she was not feeling well-

DEFENDANT: If she wasn't playing-

DETECTIVE BOWDEN: Over the weekend or the week before?

DEFENDANT: If she wasn't playing regular and stuff, but far as I know she was playing and everything. That's what I'm saying. The night before we went to sleep how I knew that she was better because she had ate and everything. She was actually rolling up and down the bed and I ain't never actually seen her do that. That's why I'm saying that was different for me and new for me.

DETECTIVE BOWDEN: She was actually rolling?

DEFENDANT: Yeah, like, you know, how they be rolling up and down the bed?

DETECTIVE BOWDEN: Okay.

DEFENDANT: She was rolling.

DETECTIVE COOPER: Was she, was she at that point able to turn herself over?

- 22 -

DEFENDANT: Yeah, she was turning herself over. I was sitting right there watching her.

*July 7, 2014 Audio/Video Interview of Defendant*

The July 7, 2014 interview of Defendant was conducted by Detective Grubbs and Detective Julia at the MNPD police station. Detective Grubbs told Defendant that the case was still "open" and they wanted to talk to her to see if they could "put some closure to it."

Defendant told the detectives that it was hard to remember what happened because it was so long ago. She said that she was getting over the flu and that Wednesday, March 2, 2005, was the first night Kar'mn slept in her crib. When she checked on her Thursday morning, Kar'mn was "blue" and barely breathing. She said Kar'mn "wasn't sick or nothing and she had ate and had ate some ice cream before she laid down." She normally fed Kar'mn formula every three to four hours and would sometimes mix cereal or baby food with the formula. She prepared and sent six or eight bottles for Kar'mn when she went to daycare. She initially tried to breastfeed, but that did not work out because Kar'mn spat up whatever milk she got. She said that Kar'mn had started sitting up and rolling in March and that when she found her in her crib Thursday morning that she had rolled to her opposite side. She could not recall if Kar'mn could feed herself. She understood that the cause of death was SIDS and thought the case was closed. She could not remember what the detectives told her ten years earlier. The following dialogue concerned how Defendant found Kar'mn on March 3, 2005:

> DETECTIVE JULIA: Now did she roll from her belly to her back, or from her back to her belly?
>
> DEFENDANT: I can't remember that far back. I just know she was on the opposite side of whatever she was that night. She was on the opposite side when I found her.
>
> . . .
>
> DETECTIVE JULIA: What do you mean?
>
> DEFENDANT: Like if you was on your back, you was on your stomach.
>
> DETECTIVE JULIA: Okay.
>
> DEFENDANT: If you was on your stomach, you was on your back.

- 23 -

The following dialogue concerned whether Kar'mn could feed herself:

DETECTIVE JULIA: Okay. Now was she holding her bottle and feeding herself or did you still have to hold her?

DEFENDANT: I can't remember that far back. But I'm thinking at that age you supposed to do that.

DETECTIVE JULIA: Do you prop the bottles with the babies?

DEFENDANT: Uh-uh.

DETECTIVE JULIA: So you always hold it for them until they're big enough to hold it themselves?

DEFENDANT: Yeah.

DETECTIVE JULIA: Okay. And you don't know whether Kar'mn could feed herself or not?

DEFENDANT: Uh-uh, I'm sorry it's just blank, everything's blank. But yeah that's what I heard in the paper, I seen in the paper.

When questioned by Detective Julia about the autopsy report showing that Kar'mn had nothing in her digestive system, Defendant said it made no sense and did not sound right. She thought Kar'mn died from SIDS and said that was what they told her before she left VUMC on the day she died.

During almost two hours of questioning by Detective Julia and Detective Grubbs, Defendant consistently maintained that she fed Kar'mn. Even when repeatedly told by Detective Julia that she could not have fed Kar'mn because her digestive tract was empty, Defendant insisted that she fed Kar'mn. Defendant stated that she could not explain the autopsy report showing that Kar'mn died of dehydration and malnutrition. This dialogue followed:

DETECTIVE JULIA: Through her whole body, her whole digestive system was empty. She didn't have a scrap of food in her.

DEFENDANT: See, that just don't sound right.

DETECTIVE: No milk, no formula, no ice cream.

- 24 -

DEFENDANT: Yeah, that's what we had though, that's what I'm saying.

DETECTIVE JULIA: Okay.

DEFENDANT: That just don't sound right unless, I don't know, if she would've throwed up in her bed and I didn't check all that.
. . .

DETECTIVE JULIA: And, and even when, when you throw up you still have something through-

DEFENDANT: Something-

DETECTIVE JULIA: All your large intestines, your small intestines, you know, something through your digestive tract.

DEFENDANT: Right.

DETECTIVE JULIA: Okay, something in your kidneys, something in your bladder, she didn't have anything.

DEFENDANT: That don't sound right.

DETECTIVE JULIA: It don't sound right. It doesn't sound right that she got ice cream, and milk, and formula-

DEFENDANT: She did.

DETECTIVE JULIA: And doesn't have anything in her body.

DEFENDANT: Right. But that's, that's what I can remember.
. . .
DETECTIVE JULIA: She didn't get a bottle of formula. She didn't get any ice cream. She didn't get any milk. She didn't get anything. She didn't have anything to eat, or drink, or anything in her body. How did that happen?

DEFENDANT: I don't know, I'm just-

DETECTIVE JULIA: Help us out with how that happened. Because you-

DEFENDANT: I don't know, unless she was having a stomach virus, that's what I'm-

DETECTIVE JULIA: No, you're, you're saying she wasn't sick, okay.

DEFENDANT: That I know of.
. . .
DETECTIVE JULIA: Cause here's where we're at. She didn't get any milk. She didn't get any formula. She didn't get any rice cereal. She didn't get any ice cream.

DEFENDANT: Uh-

DETECTIVE JULIA: How did you not feed your baby?

DEFENDANT: I did feed her.

DETECTIVE JULIA: How did you not give her that formula? How did you not give her that rice cereal? Did you not have it?

DEFENDANT: I had it.
. . .
DETECTIVE JULIA: Okay, why didn't you give it to her?

DEFENDANT: I did, I just don't understand why she didn't have nothing.

DETECTIVE JULIA: She didn't have nothing cause nothing was given to her to eat.

DEFENDANT: I did give her something unless it just wasn't staying down.

In following dialogue, the detectives address Defendant's religious or moral beliefs:

DETECTIVE JULIA: She wasn't, she wasn't given anything to eat.

DETECTIVE GRUBBS: [Defendant], you said you were a child of God and you were gonna pray, what are you gonna pray about?

DEFENDANT: That this come to a closure.

DETECTIVE GRUBBS: Do you think God will forgive you for this?

DEFENDANT: Yeah, if I didn't do nothing. And she could've died in her own sleep or something.

DETECTIVE JULIA: By not doing anything do you-

DEFENDANT: And maybe the, nah, I'm gonna pray that the truth come out because I know I would've fed my baby.

DETECTIVE GRUBBS: The truth is out there. We told you what the truth is. The truth is she wasn't fed.

DEFENDANT: I just don't know why she wouldn't've been.

DETECTIVE GRUBBS: Is it just hard for you to come to grips that maybe you didn't feed her or care for her like you should have?

The following dialogue deals with Kar'mn possibly not getting formula or food because the bottle propped up for Kar'mn to self-feed or because the hole in the nipple was too small for the formula mixed with cereal or baby food to flow:

DEFENDANT: The only thing I can think about is the two or three bottles that was up under the bed maybe she didn't get, but I remember giving her that last bottle. And she looked perfectly fine when she laid down. Now far as her being dead when I woke up, now that's a totally different thing. And then you saying she wasn't fed for two days, that couldn't've been right.

DETECTIVE GRUBBS: Is it hard for you to come to grips that maybe you didn't care for her or feed her like you should have?

As the following dialogue shows, near the end of the interview, Detective Grubbs and Detective Julia repeatedly questioned Defendant about not feeding Kar'mn:

DETECTIVE GRUBBS: Because I've listened to the, the interviews you did with the other two detectives and they clearly stated to you what she died of. Malnourished and dehydrated, okay. Now how you choose to, to deal with that and accept that is up to you but the bottom line that it is what it is and there's no getting around that.

DEFENDANT: So what does that mean?

DETECTIVE GRUBBS: It means that doesn't change this.

DEFENDANT: Okay.

DETECTIVE GRUBBS: This is always gonna be what it is, okay. It doesn't change the outcome. It just changes whether or not you choose to, to accept what we're telling you.

DEFENDANT: Oh, it's a hard pill to swallow.

DETECTIVE JULIA: Is there any reason, any reason you have for not feeding her?

DEFENDANT: I can't say that she didn't have no formula cause that wouldn't've been, I mean, that would've been a reason but far as I know she did.

DETECTIVE JULIA: [Defendant] do you have any reasons for not feeding her?

DEFENDANT: As far as I know I fed her so I don't.

DETECTIVE JULIA: So, don't, you have no reasons for not feeding her? Do you have any reasons for not feeding her?

DEFENDANT: I just, I can't recall it.

DETECTIVE JULIA: So, do you have any reasons for not feeding her?

DEFENDANT: I don't see why she would [not]'ve ate.

DETECTIVE JULIA: [Defendant], do you have any reasons for not feeding her?

DETECTIVE GRUBBS: Whether you're ready to come to grips with this or not, it's a yes or no question.

DEFENDANT: I just can't see her not eating. I see her (inaudible), I don't know.

DETECTIVE JULIA: [Defendant], do you have any reasons for not feeding her?

DEFENDANT: Huh?

DETECTIVE JULIA: [Defendant], now is your opportunity. Do you have any reasons for not feeding her?

DEFENDANT: Opportunity for what?

DETECTIVE JULIA: To say, to answer the question. Do you have any reasons for not feeding her?

DEFENDANT: Far as I know she ate.

DETECTIVE JULIA: I'm asking you, do you have any reasons for not feeding her?

DEFENDANT: What am I supposed to say?

DETECTIVE JULIA: Do you have any reasons for not feeding her?

DEFENDANT: It wasn't no reason for not feeding her cause I fed her. It wouldn't've been no reason for not feeding her.

DETECTIVE JULIA: Okay.

DEFENDANT: But I fed her.

*Testimony of Velina Dixon*

Velina Dixon, Kar'mn's maternal grandmother, testified that she lived about a ten-minute drive from Defendant during the six months of Kar'mn's life. She said that she visited her daughter and Kar'mn about once a week. She said that she knew Kar'mn was having problems digesting. She said that digestive problems ran in her family, that her oldest daughter had problems digesting and holding milk down, and that the doctors had to do surgery on her before she gained weight. She said that she saw cans of milk provided through WIC at Defendant's apartment and that she also bought formula for Kar'mn. She said that, the week before Kar'mn died, Defendant had the flu, and Kar'mn had a cold. She observed Kar'mn "constantly" spitting up milk when Defendant fed her.

- 29 -

Defendant called her on the morning of March 3, 2005, and said Kar'mn was having trouble breathing and was turning blue. Shameka Dixon immediately called 9-1-1. Shameka and Velina Dixon drove to Defendant's house but could not go in because emergency personnel were already there. She said that she stayed with Defendant's other two children while Defendant and Shameka Dixon went to the hospital. She said when she finally got to the hospital, she was interviewed by the detectives.

On cross-examination, Velina Dixon agreed that she could have told Detective Cooper during her 2005 interview that Kar'mn "would eat every four hours, usually a combination of milk and cereal, and [Defendant] provide[d] juice and water between meals[.]" She also agreed that was consistent with what she recalled being Kar'mn's "normal appetite."

## Analysis

On appeal, the State claims the trial court erred in granting Defendant's motion for judgment of acquittal for aggravated child neglect.

### *Judgment of Acquittal*

The trial court may grant a judgment of acquittal at the close of the State's proof or at the close of evidence, either before or after the jury's verdict, but only if the evidence is legally insufficient to establish the elements of the offense. Tenn. R. Crim. P. 29(b); *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013); *State v. Gregory B. Snow*, No. C.C.A. 85-266-III, 1986 WL 13056, at *1 (Tenn. Crim. App. Nov. 20, 1986). "When a motion for a judgment of acquittal is made at the close of all of the evidence, 'the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence.'" *State v. Collier*, 411 S.W.3d 886, 893 (Tenn. 2013) (quoting *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010)). "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *Little*, 402 S.W.3d at 211. "That is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Collier*, 411 S.W.3d at 893-94 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In determining whether to grant a judgment of acquittal, the trial court must not reweigh the evidence. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The decision to grant a judgment of acquittal is a question of law, and our review is de novo. *State v. Lawrence Dewayne Stoner*, No. W2018-01230-CCA-R3-CD, 2019 WL 2895027, at *6 (Tenn. Crim. App. July 3, 2019) (citing *Little*, 402 S.W.3d at 211), *perm. app. denied* (Tenn. Oct. 14, 2019).

At the time of Kar'mn's death, March 3, 2005, Tennessee Code Annotated section 39-15-402 provided in pertinent part:

> (a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in Section 39-15-401 and:

> (1) The act of abuse or neglect results in serious bodily injury to the child; or

> (2) A deadly weapon is used to accomplish the act of abuse.

> (b) A violation of this section is a Class B felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

Tenn. Code Ann. § 39-15-402 (2005).[15]

On March 3, 2005, child abuse and neglect were defined in Tennessee Code Annotated section 39-15-401(a), which provided:

> (a) Any person who *knowingly*, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or *neglects such a child so as to adversely affect the child's health and welfare* commits a Class A misdemeanor; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (2005) (emphasis added).

In summary, reading the two chapters together—a person who knowingly neglects a child so as to adversely affect the child's health and welfare commits child neglect under section 39-15-401, and if the neglect results in serious bodily injury to the child, then the person commits the offense of aggravated child neglect under section 39-15-402.

---

[15] In 2005, Tennessee Code Annotated section 39-15-402 was amended by deleting the section in its entirety and substituting new provisions. However, the new provisions did not become effective until July 1, 2005. *See* 2005 Tennessee Laws Pub. Ch. 487 (S.B. 504).

*Mens Rea of Knowing*

Concerning the *mens rea* necessary to convict Defendant of aggravated child neglect, the trial court instructed the jury that:

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.[16]

The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

*De Novo Review*

As stated previously, this court reviews the trial court's granting of a judgment of acquittal after the jury returns a verdict of guilty *de novo*.

According to the autopsy report and the testimony of Dr. Hawes, the cause of death was "[d]ehydration and malnutrition," the contributing cause of death was "[i]nterstitial pneumonitis," the "manner of death was [h]omicide," and the circumstances of death w[ere] "[n]eglect." The cause of death, the manner of death, and the circumstances of death are not disputed. Dr. Hawes testified that Kar'mn was severely dehydrated and that "[t]here was evidence of acute and chronic malnutrition, as evidenced by, there was the absence of food and feces in waste products, in other words there w[ere] no feces in the colon. The thymus gland [was] shrunken or atrophied." Dr. Hawes's testimony is not disputed.

Kar'mn was born on September 5, 2004, and weighed six pounds, ten ounces at birth. Defendant and Kar'mn were discharged from the hospital on September 7, 2004,

---

[16] The trial court instructed the jury on the statutory definition of knowingly codified at Tennessee Code Annotated section 39-11-106(a)(20). The Committee on Pattern Jury Instructions (Criminal) provides an alternate instruction for "knowingly" because the "Committee is of the opinion that the statutory definition of knowingly (as well as intentionally and recklessly) may be confusing to jurors." *See* T.P.I. Crim. 2.09.

after nurses determined that Kar'mn latched and that Defendant knew how to feed her. Defendant's initial attempts to breastfeed Kar'mn were not successful. At Kar'mn's first newborn follow-up, three days after discharge, Kar'mn was found to be jaundiced and dehydrated, and she was switched to soy formula. Defendant received adequate assistance to have a sufficient supply of formula for Kar'mn. Defendant took Kar'mn for the second newborn follow-up visit where Kar'mn was found to have gained five ounces, and her "general appearance" was stated to be "well[-]developed, well[-]nourished; alert and vigorous." Defendant took Kar'mn for her two-week checkup where Kar'mn was found to have lost approximately ten percent of her birth weight. At this visit, Defendant admitted that with her last baby she occasionally added extra water to make the formula go further. She denied doing that with Kar'mn. Defendant took Kar'mn for her two-month checkup, and Kar'mn weighed nine and a half pounds, and her "general appearance" was found to be "well[-]nourished[,] alert[,] and vigorous." Defendant took Kar'mn to the VUMC Emergency Department on December 7, 2004, with complaints of a "five-day history of diarrhea without emesis." On January 26, 2005, Defendant took Kar'mn to VUMC for a health maintenance visit. Kar'mn weighed 11.62 pounds, and her "general appearance" was listed as "well[-]developed, well[-]nourished: alert and vigorous." The "impression" was a well infant, normal growth, and normal development. Kar'mn received her scheduled immunizations.

Defendant enrolled Kar'mn in daycare at Creative Academy after she turned six weeks old. Ms. Owens, the owner of Creative Academy, advised Defendant early on that she was feeding Kar'mn "wrong" and that Kar'mn should be fed formula and not juice and water. According to Ms. Owens, Kar'mn was never denied admission to daycare because Defendant failed to provide enough bottles of prepared formula for the staff at Creative Academy to feed Kar'mn. Ms. Owens testified that on Friday, a few days before Kar'mn died, Defendant attempted to bring Kar'mn to daycare. Because Kar'mn was sick, Creative Academy did not accept her. Ms. Owens testified that Defendant kept her three children "all clean and neat" and that she never saw Kar'mn look like she did in the two autopsy photographs Detective Cooper showed her shortly after Kar'mn's death. Ms. Owens said that, if she had seen Kar'mn look like she did in the autopsy photographs, she would have contacted the authorities.

Velina Dixon, Defendant's mother and Kar'mn's grandmother, testified that she saw Kar'mn "[m]aybe once a week" and that Kar'mn typically spent the night with her "[m]aybe every other weekend." She said she knew Kar'mn had problems digesting her food, a condition that she said "ran in her family." She said she saw "cans of milk" at Defendant's house. She said she bought formula and took it to Defendant's house about a month before Kar'mn "passed away." She said that Defendant had the flu and that Kar'mn had a cold over the weekend before Kar'mn died.

In the two interviews conducted by MNPD detectives in 2005, Defendant steadfastly maintained that she fed Kar'mn. In the third interview, conducted over ten years after Kar'mn's death, the detectives repeatedly asked rhetorical questions by telling Defendant that she could not have fed Kar'mn because Kar'mn died of starvation and dehydration and had nothing in her gastrointestinal tract. In response to the rhetorical questions, Defendant never wavered in her claim that she fed Kar'mn. After repeated questioning, Defendant offered as a possible explanation that she may have "propped" Kar'mn's bottle so as to allow her to self-feed or that the hole in the nipple might have been too small for the cereal and formula mixture to flow through.

Kar'mn died on Thursday, March 3, 2005, only thirty-six days after her January 26, 2005 health maintenance visit, where the medical records showed that she was "well[-]developed, well[-]nourished: alert and vigorous" and the "impression" was that she was a well infant, with normal growth and normal development. Defendant took Kar'mn to every scheduled doctor's visit and to the emergency room on one occasion. Throughout three interviews over a ten-year time span, Defendant steadfastly claimed that she fed Kar'mn. Ms. Owens testified that when she saw Kar'mn a few days before her death, Kar'mn was sick but that she did not look like she did in the autopsy pictures. According to Defendant, Kar'mn spent Friday night, February 26, and Saturday night, February 27, with her mother, Velina Dixon. Velina Dixon testified that Kar'mn was sick with a cold but otherwise appeared to be okay. Dr. Hawes testified that she was not provided with a history of Kar'mn's being sick during the week before her death when she performed the autopsy and issued her report stating the cause of death. It is unclear what happened in the last few days of Kar'mn's short life, but we determine that the evidence was insufficient to prove that Defendant *knowingly* did not feed Kar'mn or *knowingly* neglected Kar'mn.

**Conclusion**

The trial court's judgment of acquittal for aggravated child neglect is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE